# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

ALICIA HAMILTON, )
)
Plaintiff, )
)
v. ) Case No. 10-CV-0718-CVE-PJC
)
UPPER CRUST, INC., a domestic for profit )
corporation, and FUAD BAITARI )
INTERNATIONAL, INC., d/b/a THE UPPER )
CRUST, INC., a domestic for profit corporation, )
)
)
Defendants. )

## OPINION AND ORDER

Now before the Court is defendant's[1] Motion for Summary Judgment and Brief in Support

(Dkt. # 20). Plaintiff filed a response in opposition (Dkt. # 21), and Fuad filed a reply (Dkt. # 23).

## I.

Plaintiff Alicia Hamilton was employed by Fuad from October 2008 to May 13, 2009 as a

"cook, prep[,] and cashier" in a cafeteria at the west campus of Tulsa Community College (TCC).

Dkt. ## 2, at 3; 20, at 1. Her "boss" at the cafeteria was Fuad Baitari, and her manager was Michelle

Recchia. Dkt. ## 2, at 4; 20, at 6. In her complaint, plaintiff alleges that, beginning on December

2, 2008, and continuing through January 2009, she was subjected to a series of offensive comments

---

[1]     The parties stipulated to the dismissal of Upper Crust, Inc. Dkt. # 14. Therefore, the only
remaining defendant is Fuad Baitari International, Inc. (Fuad).

and physical contacts[2] by Charles Seaton, another employee of defendant at the TCC cafeteria. Dkt. # 2, at 3-4. She testified in her deposition that she began to have problems with Seaton as early as October 2008. Dkt. # 20-1, at 2.

Hamilton first reported Seaton's behavior to Baitari in early December 2008, after Seaton had "[been] inappropriate" "a few times." Dkt. # 21-5, at 3. Hamilton claims that she went to Baitari's office to tell him about the problems she was having with Seaton, and that Baitari said "he was going to have a talk with [Seaton] and take care of the problem," and that he told Hamilton that if similar problems should arise in the future, she should "feel comfortable coming to him and telling him." Dkt. # 20-1, at 3-4. Defendant claims that, after plaintiff's initial complaint, Baitari called Frank Howard, a police officer employed by TCC, to attend a meeting with Hamilton and Seaton in December 2008. Dkt. # 20, at 4. Howard also attests to having attended such a meeting. Dkt. # 20-4. At that meeting, defendant claims that Hamilton complained that Seaton was aggressive toward her; Fuad also claims, however, that Hamilton admitted to having accepted gifts of money from Seaton, and that Hamilton made general complaints, but no specific allegations. Dkt. # 20, at 4. Hamilton characterizes defendant's description of the meeting with Howard as "misleading." Dkt. # 21, at 5.

Following her initial report to Baitari, Hamilton was off work for two weeks for the Christmas holiday. Dkt. # 2, at 4. She alleges that, after she returned to work, Seaton was "very rude to her and continued to make insulting comments." Id. Hamilton attributed that behavior to

---

[2]  Hamilton claims that Seaton "offered [her] money if she would let him touch her private areas," asked her if "she would get mad at him if he touched her," approached her from behind while she was working and squeezed her waist, grabbed her buttocks, called her offensive names, and made numerous sexual comments to her. Dkt. # 21, at 6.

Baitari having said something to Seaton about her complaint.[3]  Dkt. # 20, at 4.  After two weeks of

continued offensive conduct by Seaton, Hamilton claims that she reported Seaton's comments and

actions to Recchia, and that Recchia told her to contact Baitari.  Dkt. # 2, at 4.

　　　　Hamilton claims that, after she complained to Recchia, an incident occurred when only she

and Seaton were at work.  She says that Seaton approached her, asked "why did you tell [Baitari]

on me?," and said that "that is why he had been so nasty to her," but that she "ha[dn't] seen real

nasty yet, [and that he would] show [her] nasty."  Dkt. # 21, at 7.  Plaintiff claims that, immediately

after that incident with Seaton, she walked to the TCC bookstore to call Baitari and inform him of

what had happened.  Id.  She claims that Baitari told her to go home, and that "he would talk to

Seaton the next day."  Id.  She claims that she was thereafter informed by Recchia that a meeting

would be held on Monday (the next business day).  Id.  Hamilton states that, on Monday, she

inquired about the meeting, and that Recchia told her that Baitari said "no one was going to tell him

how to run his business," and that she should "just go home."  Id.  That account of Hamilton's

reports to Baitari in her response to the summary judgment motion varies from that presented in her

deposition.  In the limited deposition transcript in the record, Hamilton stated that she went into

Baitari's office to report Seaton's conduct to Baitari, and that Baitari thereafter called Howard to

meet with Hamilton and Seaton.[4]  Dkt. ## 20, at 4; 20-1, at 6-8.

---

[3]　　　　The Court was not provided in the summary judgment record with a full version of plaintiff's
deposition transcript.  As a result, it is difficult to gain the full context of plaintiff's version
of events in December 2008 and January 2009.

[4]　　　　Hamilton again disputes defendant's description of this meeting as "misleading."  Dkt. # 21,
at 5.  She did, however, testify at her deposition that she was part of a meeting with Howard,
Seaton, and Baitari in January 2009.  Dkt. # 20-1, at 7.

In any case, it is undisputed that a meeting occurred among Baitari, Seaton, Hamilton, and Howard in January 2009.[5]  Howard and Fuad claim that, at that meeting, Seaton "admitted that he had tried to touch [Hamilton]."[6]  Id.  Hamilton testified that she did not remember exactly what was said in the meeting, and disputes Fuad's account; she also testified, however, that Baitari and Howard met privately with Seaton during this meeting.  Dkt. # 20-1, at 8-9.  The parties do not dispute that Seaton was terminated from Fuad's employment as a result of the January 2009 meeting, Dkt. # 20, at 5, although Hamilton claims that she was never told that Seaton had been fired.  Dkt. # 20-1, at 9.  Hamilton attested that, apart from firing Seaton, she wanted Baitari to "protect [her] as his employee, to not let [Seaton's behavior] go on," and that she did not "feel that he took [her] seriously at all."  Dkt. # 20-1, at 11.  Hamilton stated that she felt Baitari "just blew the situation off," and that he "took it lightly and then he never really communicated back . . . to reassure [her] that the issue was properly taken care of."  Id.

Hamilton states that she has had no contact with Seaton since the date of his termination. Dkt. ## 20, at 5; 21, at 5.  She claims, however, that Seaton made a comment to her as he exited the meeting with Baitari that she interpreted as a threat.  Dkt. # 20-1, at 10.  As a result, after the meeting, Hamilton "informed the campus police (who had been called in) that she wished to pursue

---

[5]     In her deposition testimony, Hamilton stated that the meeting in January was the result of her third complaint to Baitari, and that she had also made another complaint after returning from Christmas vacation.  Dkt. # 21-5, at 4.

[6]     By affidavit, Seaton claims that he told Baitari that he "had touched [Hamilton] because [he] wanted [Baitari] to let him go."  He states that, "[i]n truth [he] had not touched or harassed [Hamilton] at all but was scared because she was asking me to buy her dope," and that, "because of [his] criminal background[, he] was afraid [he] was going to get . . . in trouble." Dkt. # 23-1, at 1.

charges against Seaton for assault."[7] Dkt. # 2, at 5. The Sand Springs Police Department[8] wrote an incident report, in which Hamilton's allegations mirror those in her complaint. Dkt. # 21-4, at 2. Following the filing of the incident report, Hamilton was informed by the Sand Springs Police Department that Seaton was a convicted felon with a parole violation. Dkt. # 2, at 5. Baitari learned that Seaton was a convicted felon two weeks after he fired him. Dkt. # 21-6, at 3. Following Seaton's termination, Hamilton continued in her position. She claims, however, that Baitari began avoiding her, and that he was present at work less frequently. Dkt. # 20-1, at 13-14. Her duties and pay remained the same, however, and Baitari was not rude to her. Id. at 14. In May 2009, Baitari offered Hamilton additional work at the Oklahoma Aquarium. At some point, Hamilton also requested and received a pay raise. Id. at 15.

The timeline of the events that followed is not clear from the summary judgment record. It appears, however, that in May 2009 a dispute arose regarding plaintiff's paycheck. Recchia testified that she received a phone call from Hamilton regarding her paycheck, during which Hamilton asked if the paycheck reflected her raise. Dkt. # 20-2, at 3. Recchia was not aware of the raise, and communicated that to Hamilton. At that point, Recchia claims that Hamilton became angry, started to "flip out," and called Baitari a liar.[9] Id. at 3-4. It appears that, on the same day that her conversation with Recchia took place, Hamilton drove from the Oklahoma Aquarium to the TCC

---

[7]      Based on the summary judgment record, it appears that Howard was the only officer present at the meetings that took place regarding Seaton. Hamilton's excerpted deposition testimony states, however, that Hamilton spoke to an "Officer Behardt" about filing charges. Dkt. # 21-5, at 4.

[8]      The west campus of TCC is in the city of Sand Springs, Oklahoma.

[9]      Hamilton claims that Recchia's testimony is "inaccurate and misleading," and refers the Court to her own version of events. Dkt. # 21, at 5.

campus to speak to Baitari about her pay raise. Dkt. ## 20, at 6; 21, at 5. Hamilton testified that Baitari apologized for the failure to include the raise, that he confirmed that Hamilton was owed extra money, and that he offered to give her a check for the difference. Dkt. # 20-1, at 16. Recchia also testified that Hamilton spoke to Baitari about the pay raise, and that Baitari apologized for his failure to properly communicate the raise and said that he would fix it. Dkt. # 20-2, at 6. Baitari then gave Hamilton a check in the amount owed to her. Dkt. ## 20, at 6; 21, at 5. Recchia and Baitari testified that Hamilton then called Baitari a liar, and said that he was mean to his staff and that he should give them a raise. Id.; Dkt. # 20-5, at 2. Recchia stated that Baitari told Hamilton that she could not "tell [him] how to run [his] business," and that Hamilton continued yelling and calling Baitari a liar. Dkt. # 20-2, at 7. Baitari then told Hamilton that she was fired, and asked her to leave. Dkt. # 20-5, at 5. When she refused, he called security to remove her. Dkt. ## 20-2, at 7; 20-5, at 5. Baitari gave Hamilton a handwritten note stating that she had been terminated. Dkt. # 21-3.

According to Hamilton, her termination was "retaliatory based on the fact that [she] filed [a] sexual harassment [claim] against [Seaton]," which "wasn't taken seriously." Dkt. # 2, at 6. She claims that, after making her complaint, she was "threatened by her employer," "given false information about job advancements," harassed by her manager by being asked to give a reason why she thought she deserved to keep her job, and given false information about a pay raise. Id. She further claims that, when she confronted Baitari, "he became irate and called her a liar[,] . . . [and] continued to yell and then fired her." Id. Hamilton testified that, when she was speaking with Baitari about the mistakes with her pay raise, both she and Baitari "were raising [their] voices at each other." Dkt. # 20-1, at 20. She also attested that, although Baitari never said that he was firing her because she complained about Seaton, she felt that the incidents involving Seaton "led up" to

her termination, and also testified that she thought Baitari fired her because he was angry that she filed a police report against Seaton.  Id. at 20-21.

Based on the allegedly wrongful actions of Fuad, Hamilton has alleged federal claims for relief for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and state law claims for relief for negligent supervision and sexual harassment.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant seeks summary judgment on all of plaintiff's claims for relief.[10]

### A. Title VII

#### 1. Sexual harassment

Hamilton's Title VII sexual harassment claim is based on the allegedly hostile work environment created by Seaton's ongoing sexual harassment. She claims that, as a result of

---

[10] Hamilton alleges that Fuad's motion for summary judgment encompasses only her Title VII claims. Dkt. # 21, at 1. Fed. R. Civ. P. 56(a) requires a party to "identify each claim or defense . . . on which summary judgment is sought." Fuad's motion requests that summary judgment be granted in its favor, but does not identify the claims its motion addresses. Moreover, the pleading includes legal arguments based only on plaintiff's Title VII claims, Dkt. # 20, at 3, and Fuad argues that it is entitled to summary judgment "on the claim." In its reply, however, Fuad claims that its motion encompasses all of plaintiff's claims, and it includes legal argument as to both the Title VII and state law claims. Dkt. # 23, at 2.

"[E]ven if [Fuad] had not explicitly moved for summary judgment on the [negligent supervision and state law sexual harassment claims], the [Court] has the authority to decide an issue on summary judgment sua sponte, if the losing party was on notice to come forward with evidence." Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009)(quoting Celotex Corp., 477 U.S. at 326)). Plaintiff's response included legal arguments regarding all of her claims, Dkt. # 21, at 19, the same set of facts relate to all four claims, and defendant's motion was not styled as a motion for partial summary judgment. Therefore, the Court finds that plaintiff was properly on notice to come forward with evidence related to all four claims, and interprets Fuad's motion as one for summary judgment as to all of Hamilton's claims.

defendant's actions, her conditions of employment were adversely affected, and that she has suffered lost wages and fringe benefits, emotional pain, anxiety, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and other pecuniary losses.

"An actionable hostile work environment claim under Title VII exists where sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." Turner v. Reynolds Ford, Inc., 145 F.3d 1346, at * 4 (10th Cir. 1998)(internal quotations omitted). "Title VII prohibits a workplace that is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. Plaintiffs must make a two-part showing to satisfy the severity showing. Christian v. AHS Tulsa Regional Med. Cent., LLC, 2011 WL 2745798, at * 3 (10th Cir. July 15, 2011). "First, the plaintiff must establish that a reasonable person would find the work environment hostile or abusive." Id. "[S]econd, the plaintiff must show that she subjectively perceived the work environment to be hostile or abusive." Id. Fuad does not dispute that Hamilton was subjected to sexual harassment by Seaton. Dkt. # 20, at 9. For purposes of the summary judgment motion, the Court will therefore assume that Hamilton has made a sufficient showing of the severity and pervasiveness of Seaton's behavior to create a genuine issue of material fact that the harassment altered the conditions of her employment or created an abusive working environment.

"In addition to establishing the hostile work environment elements, the plaintiff must also identify a basis for holding the employer liable under Title VII." Chapman v. Carmike Cinemas,

307 F. App'x 164, 168 (10th Cir. 2009)(unpublished).[11]   Potential bases for liability include vicarious liability and employer negligence.  Id.  "The Supreme Court has held that an employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee."  Chapman, 307 F. App'x at 169.  Because there is no evidence in the summary judgment record that Seaton was a "supervisor with immediate (or successively higher) authority" over Hamilton, this basis for liability is inapplicable.  See id.; see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 760 (1998).[12]

An employer may also be directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment.  Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it."  Id. at 1241-42; see also Turner, 145 F.3d at * 4 (employer may be liable where it "knew about, or should have known about, the harassment and failed to respond in a reasonable manner").  "Thus, the focus is not

---

[11]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

[12]     Contrary to plaintiff's arguments, Dkt. # 21, at 15, defendant has not asserted an affirmative defense under Ellerth and Faragher v. City of Boca Raton, 524 U.S. 775 (1993).  The purpose of the Ellerth-Faragher defense is to "recognize the employer's affirmative obligation to prevent violations, give credit to employers who make reasonable efforts to discharge their duty, and acknowledge that the employee has a coordinate duty to avoid or mitigate harm by availing herself of the employer's preventive or remedial apparatus."  Christian, 2011 WL 2745798, at * 3 (internal quotations omitted).  Fuad's defense is not based on plaintiff's failure to avail herself of defendant's "remedial apparatus"; instead, Fuad argues that, upon plaintiff's complaint, Baitari took appropriate action.

on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for failing to intervene." Chapman, 307 F. App'x at 171. In this context, "courts must make two inquiries: first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998).

An employer is obligated to respond only to harassment of which it actually knew or, in the exercise of reasonable care, should have known. Id. Hamilton claims that she "complained multiple times between December 2, 2008 and January 26, 2009" to both Recchia and Baitari. Her testimony, however, describes only three reports made: one before leaving for Christmas vacation in 2008; one, about which no detail is provided, upon returning from break; and one made several weeks later in January 2009. Dkt. ## 20-1, at 3-4; 21-5, at 4. Plaintiff also testified that she made a complaint to Recchia after returning from Christmas vacation in January 2009. The Court finds that those incidents put Fuad on notice, and triggered its obligation to respond.[13] Adler, 144 F.3d at 674.

Plaintiff's additional attempts to show notice to Fuad fail. Although plaintiff alleges that Seaton's harassment had occurred since October 2008, Dkt. # 20-1, at 2, she has presented no evidence of any incident prior to December 2008 that did or should have put her supervisors on notice of Seaton's harassment. Hamilton also relies on defendant's lack of written company policies regarding sexual harassment and failure to conduct a background check of Seaton, Dkt. # 2, at 6, to show that her supervisors should have known of the potential for harassment. The Tenth

---

[13]     For purposes of the summary judgment motion, the Court will assume that notice as to Baitari and Recchia was effective as notice to Fuad. See Restatement (Third) of Agency § 5.02 (2006).

Circuit has held, however, that there is no duty under Title VII to promulgate and implement antidiscrimination policies. <u>Zisumbo v. McCleodUSA Telecomm. Servs., Inc.</u>, 154 F. App'x 715, 728 (10th Cir. 2005)(unpublished).[14] And the Court has not found any authority to support the proposition that Title VII imposes a requirement on employers to perform background checks on their employees. Thus, the Court will impute knowledge to Fuad based only on the complaints made by Hamilton to Baitari and Recchia in December 2008 and January 2009.

Plaintiff argues that Fuad responded inadequately to harassment of which it knew or should have known. The Tenth Circuit has adopted a reasonableness test with regard to the adequacy of an employer's actions; that is, courts must ask "whether the remedial and preventative action was reasonably calculated to end the harassment." <u>Adler</u>, 144 F.3d at 676. "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." <u>Id.</u> "In cases where effectiveness is not readily evidenced by a stoppage, [courts] consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment." <u>Id.</u> "By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline." <u>Id.</u> An employer is obliged to respond to repeat conduct, and

---

[14]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

"whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline." Id. A court may determine on summary judgment whether an employer's responses to claims of sexual harassment were reasonable as a matter of law. Holmes v. Utah, Dep't of Workforce Servs., 483 F.3d 1057, 1069 (10th Cir. 2007).

Plaintiff testified that she first reported Seaton's conduct to Baitari in December 2008. Dkt. # 21-5, at 3. Hamilton stated that she went to Baitari's office to make the complaint, and that Baitari encouraged her to tell him what had happened. Dkt. # 20-1, at 4. She claimed that she "told [Baitari] what had been going on and that [she] was get[ting] very uncomfortable around Charles," and that Baitari then told her "that he was going to have a talk with Charles and take care of the problem," and that, if the behavior continued, "to feel comfortable coming to him and telling him." Id. Baitari and Howard attested that, after this first complaint by Hamilton, Baitari asked Howard to meet with Seaton and Hamilton in the TCC cafeteria. Dkt. ## 20-4, at 1; 20-5, at 9-10. Plaintiff disputes defendant's account of the meeting, characterizing it as "misleading" and stating that it does not include a description of her report to the Sand Springs Police Department. Dkt. # 21, at 5. She has not, however, supported her dispute of defendant's account by citing to materials in the record or by arguing that the materials cited do not establish the absence of a genuine dispute as required by Fed. R. Civ. P. 56(c). Consequently, pursuant to Fed. R. Civ. P. 56(e)(2), the Court can consider the fact of the meeting with Howard to be undisputed for purposes of the summary judgment motion. The undisputed facts in the case show that, following plaintiff's initial complaint, TCC closed for Christmas vacation. Dkt. ## 20, at 4; 21, at 5. Upon plaintiff's return to work, Seaton again engaged in offensive conduct toward plaintiff; she claims that she reported it to Baitari upon her return, and again to Recchia and Baitari several weeks later. When that conduct was reported,

plaintiff states that she was sent home and that a meeting was held on the next business day. As a result of that meeting, Seaton was terminated. Dkt. ## 20, at 5; 21, at 5.

The Court does not find that Hamilton has put forth sufficient evidence to establish that Fuad responded inadequately to her reports about Seaton. Plaintiff bears the burden to show that defendant acted unreasonably. <u>Chapman</u>, 307 F. App'x at 171. Following the first complaint regarding Seaton's conduct, the record shows that, at the very least, Baitari spoke to Seaton about his conduct. The Court finds that Baitari's prompt investigation of plaintiff's concerns was reasonably calculated to put an end to Seaton's behavior, and was proportional to plaintiff's reports of harassment. <u>See</u> <u>Adler</u>, 144 F.3d at 676.

Following that meeting, Seaton continued to engage in harassing conduct toward Hamilton. "Repeat conduct may show the unreasonableness of prior responses." <u>Adler</u>, 144 F.3d at 676. But "an employer is not liable, although a perpetrator persists, so long as each response was reasonable." <u>Id.</u> After plaintiff again reported Seaton's behavior to Baitari in late January, the record shows that Baitari held another meeting among himself, Howard, Seaton, and Hamilton, and that, following this meeting, and Seaton's admission of harassing behavior, he was terminated. The time from plaintiff's first complaint to Seaton's termination was less than two months, and Baitari responded to plaintiff each time she came forward with complaints about Seaton.[15] The Court finds nothing in the record to show that this response was not reasonable.

---

[15]     Plaintiff testified that she made another complaint to Baitari earlier in January 2009. There is no information in the summary judgment record, however, regarding that complaint, or Baitari's response. Therefore, plaintiff has not met her burden of showing unreasonableness with regard to her alleged second complaint.

Hamilton has not proposed alternate solutions that Baitari should have pursued after her complaints about Seaton's harassment. E.g., Aguiar v. Bartlesville Care Cent., 2011 WL 1461541, at * 6 (10th Cir. 2011)(considering plaintiff's proposed actions that her employer could have taken, and finding that a rational trier of fact could find the employer's response inadequate). On the contrary, she states that Seaton's termination was appropriate, but contends that Baitari should have better informed her about what was going on, and taken her complaints more seriously. The Court does not find evidence in the summary judgment record from which a rational factfinder could find that Baitari failed to take plaintiff's complaint seriously.[16] Although plaintiff was not removed from all contact with Seaton following her initial complaint, and although Seaton's harassment unfortunately persisted, "courts must balance the victim's rights, the employer's rights, and the alleged harasser's rights." Adler, 144 F.3d at 677. Consequently, although "responses must progress more rapidly in proportion to more serious and frequent harassment," the reasonableness inquiry does not require "excessive discipline" after an initial complaint of harassment by a plaintiff. Id. at 676-77. As noted, the Court finds that Baitari's response to plaintiff's initial complaint was reasonable in scope, and that he appropriately accelerated his treatment of Seaton with her subsequent complaint(s). And the Court finds no support for plaintiff's contention that an

---

[16]     Baitari testified that, when Hamilton first complained to him, he spoke to Recchia about the complaint. Dkt. # 21-6, at 5. He told Recchia that the situation between Hamilton and Seaton was "very sensitive," because inappropriate behavior by Seaton could be sexual harassment, and any complaint against Seaton, who is African-American, could be construed as racially discriminatory. Id. He testified that he was "faced with a situation where [he had] two people telling [him] two different things, and [that] both situations [were] discrimination." Id. There is no evidence, however, that Baitari's impressions of the situation altered his approach toward Seaton or his willingness to investigate plaintiff's claims of harassment. Therefore, the Court does not find that these statements by Baitari could support a finding that Baitari failed to respond to or to take seriously plaintiff's complaints.

employer's actions may be unreasonable based solely on a failure to communicate adequately with the reporting employee. Because plaintiff has failed to present evidence sufficient to support a finding of unreasonableness, she has not carried her burden to impose liability on Fuad. Therefore, her Title VII claim for hostile work environment based on sexual harassment must fail.

### 2. Retaliation

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). To make a prima facie case of retaliation, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the opposition and the adverse action. Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004). An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity. Annett v. Univ. of Kan., 371 F.3d 1233, 1239-40 (10th Cir. 2004); Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982). If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009). If the employer comes forward with a legitimate, non-discriminatory reason for its actions, the burden shifts to the employee to show that employer's stated reason is pretextual. Id.

There is no dispute that plaintiff engaged in protected opposition to discrimination by reporting Seaton's actions toward her, or that, subsequent to her reporting, she was subject to an adverse employment action when she was terminated. E.g., Turner, 145 F.3d at * 12 (reporting sexual harassment is protected opposition to discrimination); Anderson v. AOL, LLC, 363 F. App'x

581, 586 (10th Cir. 2010)(unpublished)[17](termination is an adverse employment action). Therefore, to make her prima facie case, Hamilton must show a causal connection between those two events.[18] "Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997). Plaintiff's final complaint against Seaton and report to the Sand Springs Police Department occurred in late January 2009. Plaintiff's termination occurred on May 13, 2009. A three or four month period, standing alone, is insufficient to create an inference of causation. Id. (four-month period insufficient); see also Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(three-month period insufficient).

Outside of temporal proximity, plaintiffs can establish the requisite causal connection by "producing evidence of circumstances that justify an inference of retaliatory motive." Adams v. Washburn Univ. of Topeka, 66 F. App'x 819, 821-22 (10th Cir. 2003)(unpublished).[19] Hamilton claims that she was terminated "as a result of her complaints and filing of the police report." Dkt. # 21, at 4. In support, she claims that her complaints against Seaton were not taken seriously, and that, after making those complaints, she was "threatened by her employer," "given false information

---

[17] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

[18] In support of such a causal connection, Hamilton relies exclusively on Van Horn v. Specialized Support Services, Inc., 269 F. Supp. 2d 1064 (S.D. Iowa 2003). The issue in Van Horn, however, was whether the plaintiff's good faith belief that actions on the part of another violated the law made her actions protected behavior under Title VII. Id. at 1072. The defendant admitted that the plaintiff was fired in retaliation for her action, so the causation element of her retaliation claim was never in dispute. See Van Horn v. Specialized Support Servs., Inc., 241 F. Supp. 2d 994, 1013 (S.D. Iowa 2003). Van Horn is therefore irrelevant to plaintiff's claim.

[19] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

about job advancements," "harrassed by Recchia," and given false information about a pay raise. Dkt. # 21, at 4. Further, she claims that, when she confronted Baitari about the allegedly false information, he "became irate . . . and then fired her." Id. Hamilton testified that "she was terminated as a result of her complaints and filing of the police report," Dkt. # 21, at 4, and that she thought that the "incidents [with Seaton] led up to [her termination]." Dkt. # 20-1, at 20. When asked about the motivating factor for her termination, Hamilton initially responded that "she was not sure" how Baitari "felt about it;" on cross-examination by her attorney, however, Hamilton stated that she thought she was fired because Baitari "was angry that [she] . . . filed a police report against [Seaton]," and that she thought that the report upset him. Id. at 20-21. She testified that, following her complaint about Seaton, Baitari "would try to avoid [her]," did not want to talk to her face-to-face, and spoke to her very seldomly. Dkt. # 20-1, at 13-14. Hamilton, however, testified that she was "not sure why" his behavior changed, and stated that her job duties remained the same, that Baitari was not rude to her, and that she was offered additional hours and a pay raise. Id. at 14-15.

Evidence that a supervisor was upset about a plaintiff's protected activity is not evidence of causation. See Adams, 66 F. App'x at 823. And outside of allegations that Baitari was upset by the fact that she filed a complaint against Seaton, Hamilton has drawn no connection, beyond her own conclusory statements, among her complaints, subsequent actions by her employer (such as the alleged provision of false information regarding job advancement opportunities and pay raises), and her termination. General allegations and opinion testimony are insufficient to establish causation. Palesch v. Miss. Comm'n on Human Rights, 233 F.3d 560, 570 (8th Cir. 2000). Viewing all the evidence in favor of the non-moving party, the Court finds that Hamilton has failed to establish the requisite causation, and has failed to make a prima facie case for retaliation.

Further, even if Hamilton had made a prima facie case for retaliation, she has failed to establish pretext on the part of Fuad. Once plaintiff makes a prima facie case of retaliation, the employer must proffer a legitimate, nondiscriminatory reason for her termination. Fuad contends that it terminated Hamilton based on her outburst at Baitari over a mistake with her paycheck. This is a legitimate, nondiscriminatory reason for Hamilton's termination, and Hamilton has the burden of demonstrating that this proffered explanation is a pretext for retaliation. Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1228 (10th Cir. 2008). "To show pretext, [Hamilton] must produce evidence of such weaknesses, implausibilites, inconsistencies, incoherencies, or contradictions in [Fuad's] proffered legitimate reason for its action that a reasonable factfinder could rationally find [the reason] unworthy of credence and hence infer that [Fuad] did not act for the asserted non-discriminatory reason." Id. Again, Hamilton has offered no evidence other than her own opinion that Fuad's proffered reason for her termination is pretextual. Hamilton admits that she went to speak with Baitari about a payroll mistake, and that she yelled at him during the discussion about it. "Title VII charges neither this Court nor the jury to act as a 'super personnel department' that second guesses employers' business judgments." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1203 (10th Cir. 2006). Baitari was free to terminate an employee for yelling at him during a discussion about her paycheck. E.g., Hernandez v. Indus. Med. Assocs., 2006 WL 2669378, at * 15 (W.D.N.Y. Sept. 15, 2006)(defendant entitled to terminate plaintiff's employment because of employee's involvement in disruptive incident). Plaintiff's disruptive behavior immediately preceded her termination, and Hamilton has not provided a sufficient basis for a rational factfinder to find Fuad's proffered reason unworthy of credence. Summary judgment is therefore appropriate.

**B.     State law claims**

In addition to her Title VII claims, plaintiff has also alleged state law claims against Fuad for negligent supervision and sexual harassment.  The Court has, however, disposed of all claims over which it has original jurisdiction.  Under 28 U.S.C. § 1367(c), a federal district court may decline supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction."  The Court recognizes that it has discretion to retain jurisdiction over supplemental state law claims in some circumstances.  United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966).  However, in Gibbs, the Supreme Court also stated that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."  Id. at 726.  A federal district court should consider at every stage of the litigation "the values of judicial economy, convenience, fairness and comity" in order to determine the appropriateness of maintaining jurisdiction.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).

The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims. The Court may make such a determination following a motion for summary judgment that eliminates all federal claims.  See Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998); Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1492 (10th Cir. 1995).  The first factor that must be considered, convenience, weighs slightly in favor of maintaining pendent jurisdiction over plaintiff's state law claims.  Discovery is complete in this action, and the only matters left for judicial involvement are resolution of the summary judgment motion and trial of the case, which is scheduled to commence on September 19, 2011.  Those factors "ti[p] slightly in favor of the Court exercising [pendent] jurisdiction."  Marker v. Retired Enlisted Ass'n, Inc., 2009 WL 812191, at * 3 (D. Colo. 2009).  A dismissal of plaintiff's state law claims without prejudice "could result in

"some minor duplication of effort" at the state court level.  Id.  Thus, "judicial economy weighs slightly in favor of this Court retaining jurisdiction."  Id.  The second factor, convenience, is "largely neutral."  All parties and witnesses appear to reside in the Tulsa metropolitan area, and neither court is "unusually convenient or inconvenient to the parties."  See id.

The Tenth Circuit has held that, however, that in cases where all federal claims are dismissed before trial, courts should "generally decline to exercise pendent jurisdiction . . . because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."  Brooks v. Gaenzle, 614 F.3d 1213, 1230 (10th Cir. 2010).  Plaintiff's remaining state law claims do not raise any issues which would implicate federal law, and the Court finds that "notions of comity and federalism" dictate a dismissal without prejudice.  See Endris v. Sheridan Cnty. Police Dep't, 415 F. App'x 34, 36 (10th Cir. 2011)(unpublished)[20]("any state-law claims . . . were inappropriate subjects for the exercise of pendent federal jurisdiction where all federal claims had been dismissed"); see also Gibbs, 383 U.S. at 726 (the Supreme Court has counseled that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . . ."); Carnegie-Mellon, 484 U.S. at 350 n.7 ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").

The Court finds that the Tenth Circuit's expressed preference for declining pendent jurisdiction outweighs the parties' slight interest in preventing delay.  Further, plaintiff will not be disadvantaged by the Court's failure to exercise pendent jurisdiction because 28 U.S.C. § 1367(d)

---

[20]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

tolls the period of limitation for any claim over which a district court originally exercised pendent jurisdiction during the period while the claim is pending and for a period of 30 days after it is dismissed.  Cf. Pointer v. W. Heights Indep. Sch. Dist., 919 P.2d 5, 7 (Okla. 1996).  Thus, the Court finds that, in the interests of comity and federalism, plaintiff's remaining claims should be dismissed without prejudice to refiling in state court.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 20) is **granted in part** and **moot in part**: it is granted as to plaintiff's Title VII claims; the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.  A separate judgment is entered herewith.

**DATED** this 2nd day of September, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT